(Slip Opinion)

# Applicability of Executive Privilege to Presidential Communications with Private Advisers

Executive privilege can apply to presidential communications with private advisers so long as the communications relate to official presidential decisionmaking, involve or reflect communications with the President or his direct advisers, and are confidential.

August 10, 2026

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

The President's authority to withhold certain sensitive information for the public good, today referred to as executive privilege, is "peculiar to our system of separation of powers" and "derive[s] from the supremacy of each branch within its own assigned area of constitutional duties." *United States v. Nixon*, 418 U.S. 683, 705 (1974); *see also Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989) ("*Congressional Requests*"). You have asked whether that privilege, and particularly the presidential communications component of it, permits the President to protect communications that he has with advisers who do not work for the Executive Branch.

Determining whether the privilege applies to any specific communication would require additional information about the facts and circumstances surrounding that communication. But as a general matter, executive privilege can apply to presidential communications with private advisers so long as the communications (1) relate to official presidential decisionmaking, (2) involve or reflect communications with the President or his direct advisers, and (3) are confidential.

## I.

### A.

Executive privilege is a necessary corollary to the President's constitutional role. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.*

A critical aspect of this assistance is the President's ability to communicate with and receive advice from others. Our Office has long recognized that the President has the "implied power [under Article II] to seek and obtain advice from whomever the President deem[s] necessary in order to faithfully execute the laws." *Constitutionality of the Federal Advisory Committee Act*, 1 Op. O.L.C. Supp. 502, 506 (1974) ("*FACA*"). That power is both a constitutional imperative and a practical necessity. As President Kennedy explained over 60 years ago, the "government needs men and women with a broad range of experience, knowledge and ability" in order for it to navigate successfully the "problems of increasing complexity and technical difficulty" that inhere in modern life. *Special Message to the Congress on Conflict-of-Interest Legislation and on Problems of Ethics in Government*, Pub. Papers of Pres. John F. Kennedy 326, 327 (Apr. 27, 1961); *accord Application of 18 U.S.C. § 209 to Continued Receipt of Standardized Restricted Stock Units Awarded Before Federal Employees Enter Government Service*, 50 Op. O.L.C. __, at *1 (Mar. 3, 2026). The President often must seek the advice of these individuals to "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982).

The President's constitutional prerogative to seek advice, however, is not limited by the employment status of the adviser. "[T]o make an informed decision," the President and his aides "must sometimes solicit information from individuals outside the White House and the Executive Branch." *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 5 (2007) ("*Dismissal and Replacement of U.S. Attorneys*") (Clement, Acting Att'y Gen.); *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (discussing the President's and his advisers' need for "sufficient elbow room . . . to obtain information from all knowledgeable sources"). The unrestrained ability to gather information is essential to the President's executive function. *Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. at 5 (citing *In re Sealed Case*, 121 F.3d at 751–52). Whether in crafting a policy or making a final decision, the President "must have the freedom to seek out whom he wishes for advice," regardless of whether that individual is a government official or a private citizen. *FACA*, 1 Op. O.L.C. Supp. at 506; *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 908 (D.C. Cir. 1993) (recognizing the "President's capacity to

solicit direct advice on *any* subject related to his duties from a group of private citizens" (emphasis in original)).

## B.

History reflects this common-sense understanding. "The orbits of advisers . . . that revolve around the President [have] not, like the heavenly bodies, follow[ed] a fixed and settled course." Richard T. Johnson, *Presidential Style*, *in Perspectives on the Presidency* 262 (Aaron Wildavsky ed., 1975). Yet throughout history, Presidents have relied on private advisers (or, at minimum, advisers outside the Executive Branch) to perform their executive function.[1]

In one well-known example, President Jackson frequently consulted an informal network of public and private advisers, often referred to as his "Kitchen Cabinet." Richard B. Latner, *The Kitchen Cabinet and Andrew Jackson's Advisory System*, 65 J. Am. Hist. 367, 367 (1978) (citation omitted). At the time, Congress did not provide funding for presidential aides or private secretaries, causing President Jackson to rely on a network of personal associates and family members to fill those roles. *Id.* at 379, 382. Though historical accounts of the group's membership vary, the Kitchen Cabinet network included government officials and unofficial advisers, including President Jackson's "friends and associates outside of government." *Id.* at 383; Richard P. Longaker, *Was Jackson's Kitchen Cabinet a Cabinet?*, 44 Miss. Valley Hist. Rev. 94, 107–08 (1957) (noting that President Jackson's policymaking and decisionmaking were carried out "through the exchange of advice by an informal and ever-changing roster of advisers selected by and operating under the influence of the President"). President Jackson consulted this informal network of advisers on "matters of policy and politics." Latner, *supra*, at 384. His advisory group has thus been portrayed as an early version of the modern White House staff. *Id.* at 378. Like the White House staff, President Jackson's informal advisory group included policy advisers, speech writers, liaisons, and publicists. *Id.* Without any sort of formalized relationship within the government, these outside advisers "serve[d] the President's needs" and

---

[1] For the purposes of this memorandum, we use the term "private advisers" to include anyone the President consults outside the Executive Branch, whether they be members of the public, state officials, or employees of other branches of the federal government.

"share[d] his perspective in overseeing the general direction of his administration." *Id.*

Even after modern Presidents began to enjoy a more robust staff than their nineteenth-century predecessors, they continued to solicit advice from advisers outside the government. For example, in the early years of his presidency, President Franklin Roosevelt received policymaking advice from a close-knit group of academics, known as his "Brain Trust." William E. Leuchtenburg, *Franklin D. Roosevelt and the New Deal: 1932–1940*, at 32–33 (1963). During Roosevelt's prior tenure as New York's governor, the Brain Trust "argued economic doctrine through long spring evenings at the Governor's fireside in Albany, held audiences for economists in a hotel suite in New York City, and wrangled over drafts of campaign speeches." *Id.* Following President Roosevelt's presidential-election win in 1932, the Brain Trust largely disbanded when certain members of the group joined the administration. *Id.* at 33. Nonetheless, President Roosevelt continued to receive private advice from some members of the group, including several college professors. Sebastian Edwards, *Gold, the Brains Trust, and Roosevelt*, 49 Hist. Pol. Econ. 1, 25–26 (2017).

President Jackson's and Roosevelt's cadre of outside advisers are among the most prominent examples, but are hardly the only ones. All too often, circumstances have made such outside expertise imperative. For instance, a shortage of gold at the Treasury caused President Grover Cleveland to invite J.P. Morgan to the White House in February 1895. *See* Grover Cleveland, *Presidential Problems* 147–50 (1904). Although Morgan initially "complain[ed]" about Treasury officials' treatment of him, *id.* at 148, he ultimately made the "wise suggestion" that the U.S. government buy "gold at a fixed price and pay for it in bonds, under Section 3700 of the Revised Statutes," *id.* at 149–50. Eighty years later, President Lyndon B. Johnson called upon the advice of "old and trusted friends from outside the Executive Branch" regarding the growing quagmire that was Vietnam. *Clinton*, 997 F.2d at 908 n.8 (quoting Lyndon Baines Johnson, *The Vantage Point: Perspectives of the Presidency, 1963–1969*, at 235 (1971)). Presidents Ford and Carter, meanwhile, maintained a special cabinet committee for labor policies that included the President of the AFL-CIO. *Id.* at 908–09 n.9. And presidential reliance on private advice has continued ever since. *See id.* at 908–09.

## II.

You have asked whether the President may assert executive privilege to protect communications between himself and private advisers. You did not indicate a specific adviser or subject matter, but specified that you were primarily concerned with the presidential communications component of executive privilege. Consistent with the nature of the privilege itself, we assumed your inquiry to be "limited to communications 'in performance of [a President's] responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (alteration in original) (quoting *Nixon*, 418 U.S. at 708, 711, 713). Based on that assumption, we advised that executive privilege would presumptively extend to such communications. We now memorialize the basis of that advice.

This section proceeds in three parts. First, we describe the historical basis of executive privilege; then, we identify the scope and components of the privilege; and finally, we explain why the privilege, and specifically the presidential communications component, can apply to the President's communications with private advisers.

## A.

The term "executive privilege" was not widely used until the Eisenhower Administration, but its lineage traces back to the Founding and its necessity is woven into the very fabric of our Constitution. Although the Constitution does not make the privilege explicit, *see Nixon*, 418 U.S. at 711, its constitutional pedigree is beyond serious dispute, *id.* at 705–06; *Congressional Requests*, 13 Op. O.L.C. at 154. Before the Constitution was even ratified, several of the Founders understood that a degree of "secrecy" would be among the necessary attributes of the "energetic executive" that the Constitution created. *The Federalist* No. 70, at 471–72 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). In the words of the first Chief Justice of the United States, John Jay,

> [t]here are cases where the most useful intelligence may be obtained, if the persons possessing it can be relieved from apprehensions of discovery. Those apprehensions will operate on those persons whether they are actuated by mercenary or friendly motives, and there doubtless are many of both descriptions, who would rely on the

5

secrecy of the president, but who would not confide in that of the senate, and still less in that of a large popular assembly.

*The Federalist* No. 64, at 434–35 (John Jay).

The doctrine has been invoked since the Nation's founding and has developed largely based on historical practice.[2] During President Washington's tenure, for example, the House of Representatives requested "instructions, correspondence and documents relating to the negotiation of the Jay Treaty." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Noting concerns about "caution" and "secrecy" in the Executive Branch's negotiations with a foreign government, President Washington refused to turn over the requested documents. *Id.* at 320–21 (quoting 1 *Messages and Papers of the Presidents* 194–95 (James D. Richardson ed., 1897)). Rather than insist on the production of the documents, the House of Representatives accepted the "wisdom" of the Executive's refusal, which "has never since been doubted." *Id.* at 320. For all the debate in the House engendered by President Washington's refusal, no Representative contested the President's claim that he had the constitutional authority to determine whether production of executive papers in response to a congressional request would be in the public good. Several Members believed there was nothing more to discuss: "The House have made a demand on the President; the President refused it; [and] this must naturally put an end to the correspondence on this subject." 5 Annals of Cong. 763–64 (1796) (statement of Rep. Samuel Sitgreaves); *see also id.* at 763 (statement of Rep. John Williams) (similar). Even those Members who objected to other portions of President Washington's letter, led by the father of the Constitution, James Madison, conceded that "[i]f the Executive conceived that, in relation to his own department, papers could not be safely communicated, he might, on that ground, refuse them." *Id.* at 773 (statement of Rep. James Madison).

---

[2] *See generally History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress: Part I—Presidential Invocations of Executive Privilege Vis-à-Vis Congress*, 6 Op. O.L.C. 751 (1982) ("*History of Refusals I*"); *History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress: Part II—Invocations of Executive Privilege by Executive Officials*, 6 Op. O.L.C. 782 (1983); *see also* Todd Garvey, Cong. Rsch. Serv., R42670, *Presidential Claims of Executive Privilege: History, Law, Practice, and Recent Developments* at 1–18 (updated Dec. 15, 2014) (discussing the various relevant judicial precedents and dating the doctrine to 1792).

Although the Jay Treaty is among the most salient historical examples of presidential refusals to produce confidential information—and Congress's acknowledgement of executive privilege as an inherent constitutional authority—it is far from the only one. In 1792, the House of Representatives requested Executive Branch documents pertaining to a failed military expedition conducted by General Arthur St. Clair against the native tribes in the Northwest Territory. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2029 (2020). President Washington sought counsel from his cabinet on the proper response and was advised "by the likes of Alexander Hamilton, Thomas Jefferson, Edmund Randolph, and Henry Knox" that he could "exercise a discretion over disclosures, communicating such papers as the public good would permit and refusing the rest." *Id.* at 2029–30 (cleaned up). The House later narrowed its requests, implicitly acknowledging the President's power to maintain the confidentiality of those documents that were not "of a public nature," after which the President produced the remaining information. *Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 96 (1998) (quoting 3 Annals of Cong. 536 (1792)).

Likewise, in 1807, Congress called on President Jefferson to provide documents relating to his claims that certain persons, most notably Aaron Burr, were conspiring to invade Spanish territory in North America. *Mazars*, 140 S. Ct. at 2030. President Jefferson provided only select documents, withholding all but a summary of the remainder for reasons of privacy and security. *Id.* Congress accepted that compromise, *id.*, as it has done numerous times since. Shortly thereafter, Burr was tried for conspiracy, and President Jefferson was subpoenaed for documents related to the conspiracy. *See Trump v. Vance*, 140 S. Ct. 2412, 2422 (2020). He again resisted disclosure. Although Chief Justice Marshall did not countenance the President's view that he was categorically immune from subpoena, Marshall acknowledged "the existence of a 'privilege' to withhold certain 'official paper[s]' that 'ought not on light ground to be forced into public view.'" *Trump v. United States*, 144 S. Ct. 2312, 2330 (2024) (alteration in original) (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807) (No. 14,694)).

Ever since, Presidents throughout history have sought to protect confidential Executive Branch information from disclosure under what we today refer to as the doctrine of executive privilege. *See generally Consti-*

*tutionality of the Presidential Records Act*, 50 Op. O.L.C. __, at *4–15 (Apr. 1, 2026); *History of Refusals I*, 6 Op. O.L.C. 751.

**B.**

For nearly 200 years after the Founding, reported court cases on executive privilege were few and far between. *See In re Sealed Case*, 121 F.3d at 739. That is not surprising given the multiple instances contemporaneous with the Founding in which Congress acquiesced in presidential refusals to divulge confidential information. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2137 (2022) (explaining that such historical practice is probative evidence of the Constitution's meaning); *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (same). It was not until the 1970s that disputes over executive privilege reached the fore, most prominently in *Nixon*, 418 U.S. 683, which serves as the foundation of modern-day executive privilege jurisprudence.

In *Nixon*, the Court recognized "the privilege of confidentiality of Presidential communications," which "derive[s] from the supremacy of each branch within its own assigned area of constitutional duties." *Id.* at 705; *see also Congressional Requests*, 13 Op. O.L.C. at 154 (explaining that the privilege is a "necessary corollary of the executive function[s] vested in the President by Article II of the Constitution"); H.R. Rep. No. 105-830, at 91 (1998) (explaining that executive privilege "derives from the separation of powers principle embodied in the Constitution"). The Court explained:

> The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, . . . has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*Nixon*, 418 U.S. at 708; *accord Trump*, 144 S. Ct. at 2330.

Since *Nixon*, several judicial decisions and opinions of this Office have further delineated the privilege's scope, making clear that it applies outside the criminal-justice context and to materials beyond communications of the President himself, and enables the President to prevent disclosure to Congress, the Judiciary, or the public. For instance, these opinions have explained that the privilege "is not limited to exchanges directly involving the President," but also applies "to deliberations among the President's advisers and their staffs." *Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *35 (Jan. 8, 2021) ("*Congressional Oversight*"); *see also In re Sealed Case*, 121 F.3d at 751–52 (holding that "communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President"). In other words, the privilege turns on the involvement of the President or his direct advisers in the communication, not on the identity of the other participant. *See In re Sealed Case*, 121 F.3d at 751. "Excluding presidential advisers and their staffs from the presidential communications component," by contrast, "would hinder the President's 'access to honest and informed advice' and limit his 'ability to explore possible policy options.'" *Congressional Oversight* at *35 (quoting *In re Sealed Case*, 121 F.3d at 751). In short, the presidential communications component of executive privilege protects materials of the President and his advisers in order to ensure the President "confidentiality in the performance of his responsibilities and his office, and in the process of shaping policies and making decisions." *Clinton*, 997 F.2d at 909 (cleaned up).

In addition to presidential communications, executive privilege applies to certain other categories of confidential Executive Branch information. Recall again that "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926). Executive privilege thus protects "the mental processes of agency officials," *In re Sealed Case*, 121 F.3d at 737 n.4, as well as "communications between high Government officials and those who advise and assist them in the performance of their manifold duties," *Nixon*, 418 U.S. at 705. The privilege furthermore protects Executive Branch "communications and documents that involve legal analysis, legal advice, and other attorney communications or work product."

*Congressional Oversight* at \*33. "[T]he reasons for the constitutional privilege against the compelled disclosure of executive branch deliberations have special force when legal advice is involved," because "legal matters are likely to be among those on which high government officials most need, and should be encouraged to seek, objective, expert advice." *Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. O.L.C. 481, 490 n.17 (1982) (citation omitted).[3]

Executive privilege also protects certain categories of information the disclosure of which would injure the public or the Nation, including confidential information pertaining to national security, foreign affairs, and law enforcement. *See Congressional Oversight* at \*30; *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 8 (2008). The President's authority to protect national security information "exists quite apart from any explicit congressional grant," as it "flows primarily from th[e] constitutional investment of power in the President." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). "[C]ourts have traditionally shown the utmost deference to Presidential responsibilities" in the national security and foreign affairs arenas, and the privilege thus provides absolute protection for "military, diplomatic, or sensitive national security secrets." *Nixon*, 418 U.S. at 706, 710; *see generally* Memorandum for C. Boyden Gray, Counsel to the President, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Access to Presidential Communications* (Dec. 21, 1989). The Executive's law enforcement functions similarly implicate the President's "conclusive and preclusive" constitutional authority, deriving from the President's "constitutional duty to 'preserve, protect, and defend the Constitution.'" *Trump*, 144 S. Ct. at 2334–35 (citation omitted); *see also Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 46 (1941).

Finally, while executive privilege in most circumstances operates as a qualified privilege, *see Nixon*, 418 U.S. at 706–07, it is rightly difficult to overcome. The Supreme Court has emphasized that "information subject

---

[3] "Although some of these components, such as deliberative process information, parallel aspects of common law privileges, each falls within the doctrine of executive privilege." *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. 131, 139 n.2 (2019).

to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Mazars*, 140 S. Ct. at 2032 (citation omitted). Even before the President formally asserts the privilege, when an outsider to the Executive Branch—whether it be Congress, the Judiciary, or a private party—demands the disclosure of potentially privileged materials, "special considerations control" due to "the Executive Branch's interests in maintaining the autonomy of its office." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). Once the President asserts the privilege, it can be overcome in a criminal proceeding only upon a showing of a demonstrated, specific need and the absence of alternative sources for the information sought. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 761. If the President determines that an assertion of privilege is warranted in connection with a congressional proceeding, Congress may overcome that assertion only by demonstrating that the information "is demonstrably critical to the responsible fulfillment of [its] functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc).

## C.

Having established the foundation and general scope of executive privilege, we now turn to your question about the privilege's applicability to the President's communications with private advisers. Because you have asked only about the privilege as applied to protecting presidential communications, our analysis is limited to that component of the privilege. Other components of executive privilege potentially could apply to presidential communications with private advisers as well, but because they depend on information regarding the content and participants of such communications that we do not possess, we do not discuss them here.

The privilege for presidential communications, like other privileges, protects communications with third parties when necessary to serve the societal goal that underscores the privilege. The scope of a privilege "is shaped by its purposes." *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982); *see also, e.g.*, *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *Fisher v. United States*, 425 U.S. 391, 403 (1976). The underlying justification for the presidential communications component of executive privilege—the need for confidentiality to encourage the provision of candid advice in aid of the President's Article II functions—could

not be served if the privilege did not apply to communications with persons outside the Executive Branch. Thus, unsurprisingly, both this Office and the courts have recognized that the privilege applies to communications with private advisers. *See, e.g.*, *Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1. We reaffirm that conclusion now.

## 1.

At bottom, the purpose of executive privilege is to protect the government's decisionmaking processes.[4] As the Supreme Court has recognized, executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is 'fundamental to the operation of Government.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Nixon*, 418 U.S. at 708). That is, to ensure good decisions are made, government decisionmakers need to hear "candid, objective, and even blunt or harsh opinions." *Nixon*, 418 U.S. at 708. "Human experience teaches," however, "that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705. Executive privilege exists precisely because difficult but necessary conversations are less likely to occur in the glare of public scrutiny.

The interests motivating the privilege are at their apex when it comes to decisions of the President. The need for "candid, objective, and even blunt or harsh opinions," *id.* at 708, is all the more important for the President, who is tasked with making "the most sensitive and far-reaching decisions entrusted to any official under our constitutional system," *Fitzgerald*, 457 U.S. at 752. As the Court in *Nixon* thus explained, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." 418 U.S. at 708. "The presidential communications privilege is rooted in the need for confidentiality to ensure that [this] presidential decision-making is of the highest caliber, informed by honest advice and full knowledge." 81 Am. Jur. 2d *Witnesses* § 491 (2026). Without a promise of confidentiality, the President's ability to "decide and act quickly" on matters of unrivaled importance would be

---

[4] As discussed above, certain components of executive privilege protect other important interests as well, such as national security and the integrity of law enforcement proceedings.

seriously hindered. *Clinton*, 997 F.2d at 909; *see also The Federalist* No. 70, at 472 (Alexander Hamilton) (emphasizing "secrecy" as an important component of an Executive Branch consolidated under one person).

The need for presidential confidentiality applies to communications with private advisers just as it does with government officials. A President might determine that a private adviser has unique insight or experience, and that full knowledge about a contemplated decision cannot be obtained through consultation with only government employees. Indeed, history is replete with examples of Presidents using private advisers as trusted confidants for these reasons. *See supra* Part I.B. When the President determines that consultation with such advisers is warranted, the confidence of those relationships serves the same critical purpose—promoting consideration of the full range of alternatives during presidential decisionmaking—as it does when he consults federal employees. Restricting executive privilege to purely intragovernmental communications would foreclose the President from relying on an array of important sources that he may find necessary to the effective discharge of his responsibilities of office. Such an outcome not only would impair the President's Article II functions, but ultimately would harm the public itself. *Cf. FACA*, 1 Op. O.L.C. Supp. at 505 ("[P]rivate committees faced with certain [Federal Advisory Committee Act] requirements might well decline to become involved in an advisory capacity with the President, thus limiting the President's ability to inform himself.").

Moreover, the same "[h]uman experience" that caused the Supreme Court to recognize the privilege may lead private parties to remain silent out of "concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705. If anything, private advisers may be more likely than government officials to have a "concern for appearances," and thus a greater need for confidentiality to encourage them to be candid. *Id.* After all, "[t]he President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." U.S. Const. art. II, § 2, cl. 1. Other officials who are likely to speak with the President have taken an oath to "support and defend the Constitution of the United States against all enemies, foreign and domestic," and to "bear true faith and allegiance to the same."

5 U.S.C. § 3331. Beyond that, the President's governmental advisers typically are publicly affiliated with him, and therefore with his policies and administration, regardless of the advice they provide. Outside advisers, by contrast, may have little or no affiliation with the President apart from the specific advice sought. Such individuals may be reluctant to provide advice on controversial or unpopular policies based on a fear of public disclosure or potential ramifications for their personal endeavors. The President must be able to protect the confidentiality of his communications with these advisers if he is to "ensure that presidential decision-making is of the highest caliber, informed by honest advice and full knowledge." 81 Am. Jur. 2d *Witnesses* § 491.

### 2.

Precedent from our Office and courts confirms that executive privilege extends to presidential communications with private advisers. In *Dismissal and Replacement of U.S. Attorneys*, Acting Attorney General Paul Clement considered whether communications with individuals outside the Executive Branch that related to the removal or replacement of U.S. Attorneys were protected by the privilege. 31 Op. O.L.C. at 5–6. He concluded that the fact "[t]hat the communications involve individuals outside the Executive Branch d[id] not undermine the President's confidentiality interests." *Id.* at 6. "Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch." *Id.* at 5. Because "[t]he communications at issue occurred with the understanding that they would be held in confidence, and . . . related to decisionmaking" of the President, "the communications retain[ed] their confidential and Executive Branch character and remain[ed] protected." *Id.* at 6; *see also* Letter for Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Pat A. Cipollone, Counsel to the President, at 1 (Sept. 16, 2019) (noting that "a President must frequently consult with individuals outside of the Executive Branch, and it is well settled that those communications are also subject to protection").

This Office reached a similar conclusion in our *FACA* opinion. There, we analyzed the constitutionality of the Federal Advisory Committee Act ("FACA"), Pub. L. No. 92-463, 86 Stat. 770 (1972), which "regulates

advisory committees 'established or utilized by the President.'" *FACA*, 1 Op. O.L.C. Supp. at 503. We determined that executive privilege "would probably not void the regulation of the President's advisory committees," but that it could limit certain provisions, such as FACA's requirement that advisory committee meetings be open to the public. *Id.* at 507. In making that determination, we discerned no difference between governmental advisers and private advisers: "[S]ince an executive officer can claim executive privilege with relation to advice or recommendations of staff members, so by analogy should he be able to claim privilege with relation to private committees." *Id.* at 508. A contrary view would undermine the President's exclusive "power to seek and obtain advice from whomever [he] deem[s] necessary in order to faithfully execute the laws." *Id.* at 506.

The D.C. Circuit relied on much the same logic in concluding that FACA did not apply to a presidential task force chaired by the First Lady. *See Clinton*, 997 F.2d at 908–09. The court observed that "[t]he ability to discuss matters confidentially is surely an important condition to the exercise of executive power," and that "[w]ithout it, the President's performance of any of his duties—textually explicit or implicit in Article II's grant of executive power—would be made more difficult." *Id.* at 909. For that reason,

> [a]pplication of FACA to the Task Force clearly would interfere with the President's capacity to solicit direct advice on *any* subject related to his duties from a group of private citizens, separate from or together with his closest governmental associates. That advice might be sought on a broad range of issues in an informal or formal fashion. Presidents have created advisory groups composed of private citizens (sometimes in conjunction with government officials) to meet periodically and advise them (hence the phrase "kitchen cabinets") on matters such as the conduct of a war. Presidents have even created formal "cabinet committees" composed in part of private citizens. This case is no different.

*Id.* at 908 (emphasis in original) (footnotes omitted). "A statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, therefore raises Article II concerns." *Id.* at 910.

The reasoning in other judicial opinions also indicates that executive privilege extends to presidential communications with advisers outside the Executive Branch. The D.C. Circuit has held that the presidential communications privilege protects communications made or received by the President's advisers even if the President was not directly involved in the communication. *In re Sealed Case*, 121 F.3d at 751–52. In doing so, the court explained that the privilege is not limited by who is sending or receiving a communication to or from the President or his direct advisers: "Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves." *Id.* at 752; *see also Leopold v. U.S. DOJ*, 487 F. Supp. 3d 1, 17–19 (D.D.C. 2020). That conclusion is consistent with *Nixon*, which emphasized that the protection applies to "communications between high Government officials" and "those who advise and assist them in the performance of their manifold duties." 418 U.S. at 705; *cf. Mazars*, 140 S. Ct. at 2035 (holding that "separation of powers concerns" raised by congressional subpoenas for the President's personal papers "are no less palpable . . . simply because the subpoenas were issued to third parties").[5]

Caselaw concerning legislative privilege supports this view as well. That privilege applies whenever a legislator or his agent is "acting in the sphere of legitimate legislative activity," *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951), and "protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those

---

[5] Several federal circuit courts have recognized a similar concept under the Freedom of Information Act's ("FOIA") Exemption 5 called the "consultant corollary," an implicit exception to the threshold requirement that documents be "inter-agency or intra-agency" to qualify for the exemption. 5 U.S.C. § 552(b)(5); *see Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9–11 (2001) (collecting cases). Those cases turn on similar principles, i.e., that "[t]he Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity." *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971); *see also Georgia v. U.S. DOJ*, 148 F.4th 724, 733–37 (D.C. Cir. 2025); *Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 665 (1st Cir. 1982). *But see Lucaj v. FBI*, 852 F.3d 541, 548–49 (6th Cir. 2017). Because these cases typically do not involve presidential communications and analyze the consultant corollary primarily in the light of FOIA's "inter-agency or intra-agency" statutory text, we do not discuss them further here.

acts,'" *United States v. Helstoski*, 442 U.S. 477, 489 (1979) (citation omitted). It covers not only intralegislature communications, but also "[m]eeting[s] with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation . . . [and] the discharge of the[] legislative duty." *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007). Indeed, "[m]eeting with 'interest' groups, professional or amateur," is "part and parcel of the modern legislative procedures." *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980); *La Union del Pueblo Entero v. Abbott*, 68 F.4th 228, 235–36 (5th Cir. 2023) (describing how legislators "routinely" meet with outside constituencies). It is true that, unlike executive privilege, aspects of the legislative privilege are expressly discussed in the Constitution in the form of the Speech or Debate Clause. *See* U.S. Const. art. I, § 6, cl. 1. But the reasoning of these decisions demonstrates that a privilege designed to protect decisionmaking processes of high government officials cannot properly function if those officials are foreclosed from gathering input from a range of sources, both within and outside the government.

In rendering our advice, we considered whether the lack of a formal, subordinate relationship between the President and private advisers undermines our conclusion that executive privilege applies to their communications. *See, e.g.*, Kenneth A. Klukowski, *Making Executive Privilege Work: A Multi-Factor Test in an Age of Czars and Congressional Oversight*, 59 Clev. St. L. Rev. 31, 71 (2011) (suggesting that "private sector involvement counsels strongly in favor of disclosure to Congress" in the executive privilege context because "[e]mployees of the private sector . . . are not by their nature subordinates to the President"). We conclude that it does not. Although private advisers are not subordinate to the President in the way that Executive Branch employees are, executive privilege resides with the President and is asserted by him. *See Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021). The D.C. Circuit has thus recognized that Executive Branch materials can remain confidential and subject to privilege even when in the possession of third parties. *See United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 390–91 (D.C. Cir. 1976) (recognizing the Executive Branch's continued confidentiality interests in materials held by a private telephone company); *cf. Murphy v. Dep't of the Army*, 613 F.2d 1151, 1156–57 (D.C. Cir. 1979) (concluding that the government could assert the FOIA exemption incorporating the deliberative-process

privilege even when the documents had been disclosed to a Member of Congress). That conclusion also tracks the long history of Presidents and their private advisers engaging in confidential communications. *See supra* Part I.B.

**3.**

That is not to say that everything the President tells a private individual is privileged. Caselaw and opinions of this Office have identified certain limitations on the presidential communications component, and those limitations apply in the context of communications with private advisers as well.

*First*, the privilege remains "limited to communications 'in performance of [a President's] responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" *Adm'r of Gen. Servs.*, 433 U.S. at 449 (citations omitted); *see also Mazars*, 140 S. Ct. at 2032; *In re Sealed Case*, 121 F.3d at 752; *Congressional Oversight* at *34. Although the privilege covers decisionmaking with respect to both constitutional and statutory functions, *see Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security*, 44 Op. O.L.C. 40, 48 (2020), it does not apply to presidential communications involving personal or non-official matters. Courts have "recognized that Presidents constantly face myriad demands on their attention, 'some private, some political, and some as a result of official duty.'" *Vance*, 140 S. Ct. at 2426 (quoting *Clinton v. Jones*, 520 U.S. 681, 705 n.40 (1997)). When it comes to the separation of powers, the Constitution recognizes a fundamental distinction between the President as officeholder and the President as private citizen.[6] Acts undertaken

---

[6] *See, e.g.*, *Vance*, 140 S. Ct. at 2426; *Trump*, 144 S. Ct. at 2332; Akhil Reed Amar, *Some Opinions on the Opinion Clause*, 82 Va. L. Rev. 647, 654 (1996). Because "[t]he President is the only person who alone composes a branch of government," there will not "always [be] a clear line between his personal and official affairs." *Mazars*, 140 S. Ct. at 2034. "The breadth of the President's discretionary responsibilities under the Constitution and laws of the United States in a broad variety of areas, many of them highly sensitive, frequently makes it difficult to determine which of his innumerable functions encompassed a particular action." *Trump*, 144 S. Ct. at 2333 (cleaned up). But "some Presidential conduct . . . certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision," such as using "the office's 'bully pulpit.'" *Id.* at 2333, 2340.

in the President's official capacity are regulated and protected by rules not available to private citizens. *See, e.g.*, *Jones*, 520 U.S. at 696; *Trump*, 144 S. Ct. at 2326–27. "But he is otherwise subject to the laws for his purely private acts." *Jones*, 520 U.S. at 696. As a result, discussions with the President purely in his private capacity do not enjoy the same privilege protections, though requests for such materials can raise separation of powers concerns in their own right. *See Mazars*, 140 S. Ct. at 2035.

*Second*, the presidential communications component of privilege applies only to communications with the President, or communications solicited and received by the President or his direct advisers. *See In re Sealed Case*, 121 F.3d at 752. "Not every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege." *Id.* Only communications and materials prepared by the President or his direct advisers, or materials solicited and received by them from others, "are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers." *Id.*[7]

*Third*, the privilege requires the communication to have been confidential at the time of its creation and that the President continue to treat it as such. That is, if the conversation occurred in public or if circumstances otherwise indicate that the communication was not confidential, the communication would not be privileged. Likewise, if the President were to publicly post the contents of confidential discussions on social media or reveal them to a crowd on the National Mall, the contents of those communications would no longer remain privileged. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. 108, 127 (2019) ("*Testimonial Immunity*") (concluding that publicly releasing a redacted version of a report "extinguish[ed] the Executive Branch's confidentiality interests in the precise information that has already been revealed"). "Despite its unquestioned significance, executive privilege . . . can be waived." *Thompson*, 20 F.4th at 26. "[V]oluntarily

---

[7] Although "communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President," *In re Sealed Case*, 121 F.3d at 752, because you have asked only about the President's communications with private advisers, we do not have occasion to address in this opinion the protections that might apply to other White House officials' communications with private persons.

reveal[ing]" information "to third parties outside the White House" without an expectation that the information will continue to be confidential thus will extinguish the privilege in regard to the specific information released. *In re Sealed Case*, 121 F.3d at 741–42.

At the same time, waiver in the executive privilege context "should not be lightly inferred." *Id.* at 741. To extinguish the privilege, a disclosure must be authorized and deliberate; it cannot be waived by "impli[cation]." Memorandum for Arthur B. Culvahouse Jr., Counsel to the President, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutional Concerns Implicated by Demand for Presidential Evidence in a Criminal Prosecution* at 18 (Oct. 17, 1988) ("*Demand for Presidential Evidence*"). When disclosure is so authorized, only the specific document or portion of that document disclosed loses its privileged status. Any portion of the document that has not been disclosed remains protected. *See In re Sealed Case*, 121 F.3d at 742 (concluding that handwritten notes on a document remained protected notwithstanding disclosure of the document's typed text). Moreover, unlike in the common law attorney-client privilege context, release of presidential communications does not extinguish "the Executive Branch's confidentiality interests over the subject matters involved" in unredacted portions of a particular document, let alone any other document touching on those subject matters. *Testimonial Immunity*, 43 Op. O.L.C. at 127. As courts have explained, a broad conception of waiver disincentivizes the Executive Branch from "voluntarily disclosing some privileged material out of the fear that by doing so they are exposing other, more sensitive documents." *In re Sealed Case*, 121 F.3d at 741. And a rule that would vitiate privilege over undisclosed communications could impede the President from discharging his constitutional duty to "withhold information the disclosure of which would be inconsistent with the public interest." *Demand for Presidential Evidence* at 18; *see also Nixon*, 418 U.S. at 705–06.

This principle applies with special force to disclosures to Congress. As a general matter, "rather than attempting to define and allocate all governmental power in minute detail," the Framers expected "that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system." *United States v. Am. Tel. & Tel. Co.*, 567 F.2d

121, 127 (D.C. Cir. 1977). To work, this balance requires an "effort to acknowledge, and if possible to meet, the legitimate needs of the other branch," known today as the accommodation process. *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981). If the Executive Branch's "provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over . . . documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations." *Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. at 8. A narrow interpretation of waiver ensures that "the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process." *Id.*; *see also Assertion of Executive Privilege Over Audio Recordings of the Special Counsel's Interviews of the President and His Ghostwriter*, 48 Op. O.L.C. __, at *9–10 (May 15, 2024) (Garland, Att'y Gen.).

### III.

For these reasons, we conclude that presidential communications with private advisers can fall within the scope of executive privilege so long as they relate to official presidential decisionmaking, involve or reflect communications with the President or his direct advisers, and are confidential.

Please let us know if we may provide any further assistance.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*
